**LTL ATTORNEYS LLP**
Enoch H. Liang (SBN 212324)
enoch.liang@ltlattorneys.com
Michael J. Song (SBN 243675)
michael.song@ltlattorneys.com
300 South Grand Ave., 14th Floor
Los Angeles, CA 90071
Phone: (213) 612-8900
Facsimile: (213) 612-3773

*Attorneys for Nonparty EVGA Corp.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| INVENSAS CORPORATION and TESSERA ADVANCED TECHNOLOGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NVIDIA CORPORATION, <br><br> Defendant. | Case No. 8:20-mc-14 <br><br> [*Case pending in the United States District Court for the District of Delaware, Case No. 19-cv-861-RGA*] <br><br> **NONPARTY EVGA CORPORATION'S NOTICE OF MOTION AND MOTION TO QUASH; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Discovery Cut Off:  Dec. 10, 2020 <br> Final Pretrial Conference:  Aug. 30, 2021 <br> Trial:  Sept. 20, 2021 <br><br> Hearing Date:  August 10, 2020 (or later) <br> Hearing Time:  TBD <br> Hearing Place:  TBD <br><br> Judge:  TBD |

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES .........................................................................iii

NOTICE OF MOTION AND MOTION........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.      INTRODUCTION ...............................................................................1

II.     FACTUAL BACKGROUND ..............................................................2

        A.      The Underlying Action Between Invensas and NVIDIA .......................2

                1.      Asserted Patents and Accused Products .........................2

                2.      Delaware Court's May 4 Discovery Order......................2

        B.      Nonparty EVGA .....................................................................4

        C.      Invensas' Subpoena and EVGA's Objections .........................5

III.    LEGAL STANDARDS ........................................................................6

        A.      Discovery Under a Rule 45 Subpoena .....................................6

        B.      Motion to Quash a Rule 45 Subpoena .....................................7

IV.     INVENSAS' SUBPOENA SHOULD BE QUASHED IN ITS
        ENTIRETY............................................................................................8

        A.      The Court Should Quash Invensas' Requests for Identification of
                EVGA Products and Unit Sales (Requests 1 and 2) .................8

                1.      Requests 1 and 2 Seek Irrelevant Information .............9

                        a.  Invensas' Prior Induced Infringement Theories.......9

                        b.  Invensas' New Induced Infringement Theories ......10

                2.      Requests 1 and 2 Would Impose an Undue Burden on EVGA.....11

                3.      Requests 1 and 2 Are Unnecessary..............................13

i

B.  The Court Should Quash Invensas' Request for Revenue (Request 2) ............................................................................................. 13

   1.  Request 2 Seeks Irrelevant Information ...................................... 13

   2.  Request 2 Would Impose an Undue Burden on EVGA .............. 17

   3.  Request 2 Seeks Confidential Information ................................... 18

C.  The Court Should Quash the Requests for EVGA's Agreements and Communications with NVIDIA (Requests 3 and 4) ............................... 18

   1.  Requests 3 and 4 Are Burdensome and Unnecessary ................. 18

   2.  Requests 3 and 4 Are Overbroad, Irrelevant, and Used for Improper Purposes ......................................................................... 20

D.  The Court Should Quash the Deposition ................................................. 22

   1.  EVGA's Supply Chain (Topic 4) ................................................. 23

   2.  Documents Requested by Subpoena (Topics 1-3 and 5) .............. 23

   3.  Admissibility of Documents Produced (Topics 6-8) .................... 24

V.  INVENSAS SHOULD BE ORDERED TO PAY EVGA'S COSTS .............. 24

VI.  CONCLUSION ................................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page No(s).</u>

CASES

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*,
   300 F.R.D. 406 (C.D. Cal. 2014) .................................................................7, 12, 22

*ASUS Comp. Int'l v. Micron Tech. Inc.*,
   2014 WL 12625461 (N.D. Cal. Apr. 21, 2014) .......................................................25

*Audio MPEG, Inc. v. HP Inc.*,
   2017 WL 950847 (N.D. Cal. Mar. 10, 2017)...........................................................24

*Avago Techs. U.S., Inc v. IPtronics Inc.*,
   309 F.R.D. 294 (E.D. Pa. 2015) ..............................................................................19

*Barry v. Medtronic, Inc.*,
   2016 WL 1056783 (E.D. Pa. Mar. 17, 2016)...........................................................11

*Concord Boat Corp. v. Brunswick Corp.*,
   169 F.R.D. 44 (S.D.N.Y.1996) ................................................................................23

*Crocs, Inc. v. Effervescent, Inc.*,
   2017 WL 3888455 (D. Colo. Jan. 30, 2017)............................................................15

*Duong v. Groundhog Enters., Inc.*,
   2020 WL 2041939 (C.D. Cal. Feb. 28, 2020)...............................................8, 20, 25

*Essociate, Inc. v. Blue Whaler Invs., LLC*,
   2012 WL 12953823 (C.D. Cal. Apr. 12, 2012) .........................................................7

*Fadalla v. Life Auto. Prod., Inc.*,
   258 F.R.D. 501 (M.D. Fla. 2007)............................................................................11

*Free Stream Media Corp. v. Alphonso Inc.*,
   2017 WL 6209309 (N.D. Cal. Dec. 8, 2017)...........................................................22

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970).........................................................13, 14, 15, 16

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ...................................................................................................2

iii

*Haworth, Inc. v. Herman Miller, Inc.*,
   998 F.2d 975 (Fed. Cir. 1993) .................................................................. 8

*In re Delta*,
   2018 WL 5033756 (D. Del. Oct. 17, 2018) .............................................. 19

*In re Trustees of Boston University Patent Cases*,
   2014 WL 12576638 (D. Mass. May 16, 2014) ...................................... 14, 15

*Intermarine, LLC v. Spliethoff Bevrachtingskantoor, B.V.*,
   123 F. Supp. 3d 1215 (N.D. Cal. 2015) ................................................... 24

*Itex Inc. v. Westex, Inc.*,
   2011 WL 856583 (N.D. Ill. Mar. 9, 2011) ........................................... 14, 15

*Katz v. Batavia Marine & Sporting Supplies, Inc.*,
   984 F.2d 422 (Fed. Cir. 1993) .................................................................. 7

*Kilopass Tech. Inc. v. Sidense Corp.*,
   2011 WL 2470493 (N.D. Cal. June 21, 2011) ......................................... 16

*Kirschner v. Klemons*,
   2005 WL 1214330 (S.D.N.Y. May 19, 2005) ........................................... 23

*L.A. Gear, Inc. v. E.S. Originals, Inc.*,
   859 F. Supp. 1294 (C.D. Cal. 1994) ................................................... 11, 21

*Legal Voice v. Stormans Inc.*,
   738 F.3d 1178 (9th Cir. 2013) .................................................................. 24

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ....................................................... 14, 15, 16

*Mannington Mills, Inc. v. Armstrong World Indus.*,
   206 F.R.D. 525 (D. Del. 2002) .................................................................. 7

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
   218 F.R.D. 423 (D. Del. 2003) .................................................................. 8

*Micro Motion, Inc. v. Kane Steel Co.*,
   894 F.2d 1318 (Fed. Cir. 1990) ............................................................... 10

*Moon v. SCP Pool Corp.*,
   232 F.R.D. 633 (C.D. Cal. 2005) .................................................... 7, 19, 20

iv

*Nidec Corp. v. Victor Co. of Japan*,
  249 F.R.D. 575 (N.D. Cal. 2007) .................................................................19

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  2006 WL 2604540 (D. Del. Aug. 24, 2006) ...............................................22

*United States v. CBS, Inc.*,
  666 F.2d 364 (9th Cir. 1982) ......................................................................20

*Vysata v. Menowitz*,
  2019 WL 2871145 (C.D. Cal. May 30, 2019) ...............................................8

*WPIX, Inc. v. Broad. Music, Inc.*,
  2011 WL 9753912 (C.D. Cal. July 5, 2011) ...........................................7, 17

**STATUTES**

35 U.S.C. § 271 ..................................................................................................2

35 U.S.C. § 287 ..................................................................................................2

**RULES**

Fed. R. Civ. P. 26 ...........................................................................................6, 7

Fed. R. Civ. P. 45 .........................................................................6, 7, 18, 24

v

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on August 10, 2020, or as soon thereafter as the matter may be heard, in the above-entitled court located at 411 West 4th Street, Santa Ana, California 92701-4516, at a time and courtroom to be determined following assignment to a specific judge, Nonparty EVGA Corporation ("EVGA") will and hereby does move the Court, pursuant to Federal Rules of Civil Procedure 26 and 45, and Civil L.R. 7 *et seq.*, 37 *et seq.* and 45-1, to quash a subpoena requesting documents and a deposition from EVGA (the "Subpoena") issued by Invensas Corporation and Tessera Advanced Technologies, Inc. (collectively, "Invensas" or "Plaintiffs") for use in a patent infringement action that Invensas filed against NVIDIA Corporation ("NVIDIA" or "Defendant") in the United States District Court for the District of Delaware ("Delaware Court") entitled *Invensas Corp. et. al v. NVIDIA Corp.*, No. 19-cv-861-RGA (D. Del. filed May 8, 2019) (the "Underlying Action"). The Subpoena specifies compliance in Los Angeles, California, thereby falling under the jurisdiction of this Court. *See* Fed. R. Civ. P. 45(d)(3)(A), (B).

EVGA makes this motion on the grounds that Invensas' Subpoena is overly broad and unduly burdensome and seeks irrelevant, confidential information, particularly given that EVGA is a nonparty and Invensas can obtain the information it purports to need from NVIDIA—a party to the Underlying Action. EVGA's motion is supported by this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Joe Darwin and Michael Song, all pleadings and papers which are of record and are on file in this case, and such other oral and documentary evidence as may be presented at the hearing of this motion.

This motion is made following conferences of counsel which took place on March 4, March 18, and May 1, 2020. Pursuant to Civil L.R. 37-2.4(a), EVGA is filing a Memorandum pursuant to Civil L.R. 7-5 rather than a Joint Stipulation pursuant to Civil L.R. 37-2 because Invensas failed to confer in a timely manner under L.R. 37-1. *See* Song Decl. at ¶ 25.

Nonparty EVGA's Mot. to Quash

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

Date: July 7, 2020                    LTL ATTORNEYS LLP

By:  *s/ Michael J. Song*

Michael J. Song (SBN 243675)
michael.song@ltlattorneys.com

*Attorney for Nonparty EVGA Corp.*

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

EVGA moves to quash Invensas' Subpoena because it is overbroad and would impose an undue burden on Nonparty EVGA, particularly given that Invensas can obtain the information it supposedly needs from party-Defendant NVIDIA.  It also seeks irrelevant, confidential information that would harm EVGA if disclosed.

The Subpoena seeks identification of EVGA products that were sold in the U.S. and incorporated accused NVIDIA Graphics Processing Units ("GPUs").  Although Invensas argues this information is relevant to its accounting of NVIDIA GPUs under its induced infringement claims, the Delaware Court recently rejected its argument that such discovery was necessary in denying related discovery from NVIDIA.  Further, these requests would impose an undue burden on EVGA because this information is not maintained in the ordinary course of its business.  However, EVGA sends NVIDIA reports with much of the requested information that can be obtained from NVIDIA.

Relatedly, Invensas seeks to require EVGA to compile confidential revenue information from sales of EVGA products that is not typically provided to NVIDIA, and thus, would not have been available to either party during a hypothetical negotiation.  This request would also impose an undue burden on EVGA.

Invensas also seeks EVGA's agreements and communications with NVIDIA, even though by the express language of the requests, it can obtain them from NVIDIA. Invensas' sole justification for seeking these documents from EVGA is that it anticipates NVIDIA will not produce them in the Underlying Action.   Invensas' rationale is rank speculation that does not justify duplicative discovery from a nonparty. Indeed, courts have sanctioned similar conduct.

Finally, Invensas' deposition request is overbroad and unwarranted.   For example, Invensas refuses to withdraw topics about EVGA's customers even though the Delaware Court denied its motion to compel customer information from NVIDIA.

For the foregoing reasons, Invensas' Subpoena should be quashed in its entirety.

## II.     FACTUAL BACKGROUND

### A.     The Underlying Action Between Invensas and NVIDIA

#### 1.     Asserted Patents and Accused Products

On May 8, 2019, Invensas filed a Complaint in the Delaware Court that accused NVIDIA of infringing five patents directed to semiconductor technology (collectively, "Asserted Patents").  *See* Compl. at ¶ 1, *Underlying Action*, ECF No. 1 (Ex. A).[1] Invensas' infringement claims are based on NVIDIA GPUs and products containing such GPUs (collectively, "Accused Products").  *Id.* at ¶¶ 8, 13-19, 28, 46, 61, 76, 91.  The Accused Products are used in graphics cards, laptops, videogame devices, supercomputers and data center products.  *Id.* at ¶¶ 13-19.

For each Asserted Patent, Invensas asserted claims for: (1) direct infringement under §§ 271(a) or (g); and (2) induced infringement under § 271(b).  *Id.* at ¶¶ 27, 36-37, 45, 52, 60, 67-68, 75, 82, 90, 97.  Because § 271(b) requires knowledge of the patent and § 271(g) requires notice of infringement,[2] Invensas' claims under these statutes depend on the date it first notified NVIDIA.  *Id.* at ¶¶ 26, 44, 59, 74, 89.  A summary of the Asserted Patents is set forth below:

| Asserted Patent No. | Expiration Date | Infringement Bases | Notice Date |
|---|---|---|---|
| 6,232,231 | 8/31/2018 | 271(b) and (g) | 12/2/2014 |
| 6,849,946 | 8/31/2018 | 271(a) and (b) | 12/2/2014 |
| 7,064,005 | 10/8/2023 | 271(b) and (g) | 5/8/2019 |
| 6,317,333 | 4/16/2018 | 271(a) and (b) | 10/13/2014 |
| 5,666,046 | 8/24/2015 | 271(a) and (b) | 2/11/2015 |

#### 2.     Delaware Court's May 4 Discovery Order

The Delaware Court recently issued an Order that is directly pertinent to Invensas' Subpoena and this Motion.  *See* May 4, 2020 Order ("May 4 Order"), *Underlying Action*, ECF No. 140 (Ex. B).  The Order addressed Invensas' request to

---

[1] All exhibits are attached to the Song Declaration, submitted concurrently herewith.

[2] *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765 (2011); 35 U.S.C. § 287(b)(2).

2

compel further responses to Interrogatory No. 6. *See* Invensas Redacted Jan. 17, 2020 Disc. Letter ("Jan. 17 Letter") at 2-3, *Underlying Action*, ECF No. 91 (Ex. C). Interrogatory No. 6 sought sales data for each NVIDIA Accused Product. *See* Invensas 1st Set of Interrogs. to NVIDIA at 2-5, 11, *Underlying Action*, ECF No. 91-1 (Ex. D). The parties' dispute focused on: (1) customer information for all sales of Accused Products made by Defendant NVIDIA; and (2) sales of Accused Products made by NVIDIA's wholly-owned subsidiaries. *See* Redacted April 29, 2020 Joint Disc. Letter ("Apr. 29 Letter") at 2-6, *Underlying Action*, ECF No. 145 (Ex. E).

Invensas argued that customer "information is necessary to avoid double-counting of sales made in the U.S. by NVIDIA, for which NVIDIA is directly liable for direct infringement, and sales made by NVIDIA's partner companies in the United States, for which NVIDIA is liable for indirect infringement." Redacted Feb. 21, 2020 Joint Disc. Letter ("Feb. 21 Letter") at 2, *Underlying Action*, ECF No. 119 (Ex. F). Invensas also argued that "liability under § 271(b) would arise where NVIDIA sold accused products to companies abroad and then induced those companies to sell the accused products in the United States." Apr. 29 Letter at 3-4 (Ex. E). Finally, Invensas argued it "may discover NVIDIA's liability for direct or induced infringement based on sales of accused products made by its wholly-owned subsidiaries." *Id.* at 4.

Invensas argued that "double-counting" issues would arise if its motion to compel were denied and nonparties produce sales data in response to its subpoenas:

> Plaintiffs were then, and still are, seeking sales data from certain third-party resellers that have sold accused products in the U.S. Plaintiffs believe that NVIDIA is liable for inducing infringing sales by the resellers. This theory of liability creates a risk of double-counting if NVIDIA produces a partial set of sales data with no customer information. The reseller units identified through third-party discovery would be added to the royalty base, and the units should not be added to the royalty base a second time from sales data produced by NVIDIA.

*Id.* at 2; *see also* Jan. 23, 2020 Disc. Conference Tr. ("Jan. 23 Hr'g Tr.") at 58:17-59:7, *Underlying Action*, ECF No. 95 (Ex. G) ("If we get all [nonparty customers'] sales, we

3

can't then incorporate that back to NVIDIA sales in any meaningful way if we don't have the [customer] information from NVIDIA.").

In response, NVIDIA identified its top 5 customers, produced all its worldwide sales data for the Accused Products, and offered to stipulate that all such sales are U.S. sales under § 271(a), which would allow Invensas to assert direct infringement rather than induced infringement for all Defendant's sales, and argued that its subsidiaries' sales were irrelevant. *See* Feb. 21 Letter at 2 (Ex. F); Apr. 29 Letter at 4-5 (Ex. E).

Based in part on NVIDIA's proposed stipulation, the Delaware Court rejected Invensas' relevance arguments and denied its motion to compel:

> Defendant has offered to stipulate that all of its sales of the accused products since May 2013 are "U.S. sales" within the meaning of section 271(a). … On the surface, it seems both to simplify matters and to work to Plaintiffs' benefit. Absent some showing that there is some potential prejudice to Plaintiffs by the proposed stipulation, I am not going to order what appears to be unnecessary discovery. Nor do I think Plaintiffs need to know every customer's name; I think my previous "five biggest customers" order is more than sufficient. And while I agree with Plaintiffs that it is likely that Defendant has the power to produce records from its wholly-owned subsidiaries, that power does not make the wholly-owned subsidiaries parties to this case or Defendant legally responsible for the actions of the subsidiaries. Thus, the records appear to be irrelevant.

May 4 Order at 2 (Ex. B).

## B.    Nonparty EVGA

EVGA is a leading United States-based distributor of NVIDIA GPU-based video cards and other products including Intel chipset-based motherboards, power supplies, and computer cases for consumers, including gaming enthusiasts and other users of advanced graphics computing packages. *See* Darwin Decl. at ¶ 2.  EVGA buys NVIDIA GPUs and uses the GPUs to build custom graphics cards, as well as additional components, to assemble a final end user product that is ready for market. *Id.* at ¶ 3. Since at least as early as January 2015, EVGA has generally not purchased product directly from NVIDIA that are incorporated into EVGA products sold in the U.S. *Id.*

EVGA generally sells its GPU-based graphics cards through four main channels: (1) e-tailers (*e.g.*, Amazon); (2) retailers; (3) distributors; and (4) systems integrators. *Id.*

Demand for GPU-based graphics cards can be highly variable as it depends on consumers seeking high-end gaming equipment and businesses seeking extremely fast graphics processing software. *Id.* at ¶ 4. For perspective, in 2019, across all GPU-based SKUs, EVGA sold more than 600,000 units. *Id.* at ¶ 5.

At any given time, EVGA carries an extensive current line of GPU-based cards. *Id.* at ¶ 4. For instance, EVGA's current line offering includes more than 400 distinct SKUs (store keeping units) of GPU-based cards with NVIDIA chipsets. *Id.* at ¶ 5. On average, a given EVGA GPU-based graphics card SKU will remain in the current line for approximately 2 years. *Id.* So if, as in this case, a subpoena asks EVGA to list out all NVIDIA-based products it has offered over a 5+ year period, the subpoena would require EVGA to specify approximately 500 distinct SKUs. *Id.*

In addition to the current line, at any given time, EVGA may have (mostly nominal) inventory of legacy products based upon ongoing final sell-through, RMAs (return merchandising authorizations), or other returns. *Id.* at ¶ 6. Currently, EVGA has legacy inventory of as many as 100 distinct SKUs for NVIDIA GPU-based graphics cards totaling not more than 10,000 units (these very small inventory sizes total less than 2% of annual sales). *Id.* These are not generally promoted for sale but will typically be liquidated over time to close out specific SKUs. *Id.*

## C.  Invensas' Subpoena and EVGA's Objections

On February 19, 2020, Invensas issued a Subpoena requesting documents and testimony from EVGA for use in the Underlying Action. *See* Subpoena Attach. A at 1 (Ex. H). The Subpoena requests information regarding "EVGA Products," *i.e.*, "any EVGA product or device incorporating one or more Accused NVIDIA Chipset that has been sold in the United States, or imported into the United States, between May 2013 and the present." *Id.* at 2. The Subpoena defined "Accused NVIDIA Chipset(s)" by listing thirty-six NVIDIA GPUs by their product family numbers. *Id.* The Subpoena

included four requests for documents ("Requests"): (1) EVGA Products; (2) unit sales and revenue for EVGA Products; (3) agreements with NVIDIA; and (4) communications with NVIDIA. *Id.* at 5.  The Subpoena also included eight deposition topics ("Topics"): (1) EVGA Products; (2) unit sales and revenue for EVGA Products; (3) agreements with NVIDIA; (4) EVGA supply chain; (5) communications with NVIDIA; (6) identification of relevant documents; (7) meaning and authenticity of produced documents; and (8) search for responsive documents. *Id.* at 6.

On March 18, 2020, EVGA timely served objections to Invensas' Subpoena. *See* EVGA Objections to Subpoena (Ex. I); *see also* Song Decl. at ¶ 18.  Accordingly, EVGA and Invensas engaged in several meet and confers and sent numerous emails discussing the scope of the Subpoena.  *See* Song Decl. at ¶¶ 17-25; *see also* June 16, 2020 Email from Song to Garten (and earlier emails) (Ex. J); April 27, 2020 Email from Garten to Song (and earlier emails) (Ex. K).  These discussions led to two modifications of the Subpoena.  First, Invensas agreed to temporarily table the deposition and Requests 3 and 4. *See* Song Decl. at ¶ 20.  Second, Invensas agreed to modify the relevant time frame from May 2013 – present to: (a) October 2014 - present, for EVGA Products containing the GP100 or GV100; and (b) October 2014 - October 2018, for EVGA Products containing the other 34 identified NVIDIA Chipsets (collectively, "Relevant Time Period"). *Id.* at ¶ 23; *see also* April 27 Email (Ex. K).

## III.   LEGAL STANDARDS

### A.   Discovery Under a Rule 45 Subpoena

The scope of discovery for a Rule 45 subpoena is defined by Rule 26.  *See* Fed. R. Civ. P. 45 advisory committee's note to 1970 amendment.  Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  However, courts are required to limit discovery if, *inter alia*, it "can be obtained from some other source that is more convenient, less burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C)(i).

6

"Although Rule 26(b) applies equally to discovery of nonparties, the fact of nonparty status may be considered by the court in weighing the burdens imposed in the circumstances."  *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993) (citations omitted); *see also Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005).  "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  "Non-parties are afforded extra protection from the courts under this rule."  *Essociate, Inc. v. Blue Whaler Invs., LLC*, No. 10-cv-2107, 2012 WL 12953823, at *3 (C.D. Cal. Apr. 12, 2012).

**B.     Motion to Quash a Rule 45 Subpoena**

"On timely motion, the court for the district where compliance is required must quash or modify a subpoena that: … (iv) subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A).  Additionally, if the subpoena "requires disclosure of a trade secret or other confidential research, development, or commercial information, ... the court may ... quash ... the subpoena ...."  Fed. R. Civ. P. 45(d)(3)(B).

"In determining whether a subpoena poses an undue burden, courts 'weigh the burden to the subpoenaed party against the value of the information to the serving party.'"  *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 409 (C.D. Cal. 2014) (citing *Moon*, 232 F.R.D. at 637).  "[O]ther factors a court should consider include the relevance of the requested information and the breadth or specificity of the discovery request."  *Id.* at 409-10 (citing *Moon*, 232 F.R.D. at 637); *see also Mannington Mills, Inc. v. Armstrong World Indus.*, 206 F.R.D. 525, 529 (D. Del. 2002) (holding that in ruling on a motion to quash, the "court is required to apply the balancing standards—relevance, need, confidentiality and harm.").  "[I]f the sought-after documents are not relevant nor calculated to lead to the discovery of admissible evidence, then any burden whatsoever imposed upon [the answering party] would be by definition 'undue.'"  *WPIX, Inc. v. Broad. Music, Inc.*, No. 11-cv-4052, 2011 WL 9753912, at *2 (C.D. Cal. July 5, 2011); *see also Mannington Mills*, 206

F.R.D. at 529 ("[E]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit.").

In addition, "[i]n its undue burden inquiry, the Court properly may evaluate whether information requested through a nonparty subpoena is readily available from a party." *Duong v. Groundhog Enters., Inc.*, No. 2:19-cv-01333, 2020 WL 2041939, at *7 (C.D. Cal. Feb. 28, 2020) (citing cases finding undue burden on a nonparty when the information could be obtained from a party); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 218 F.R.D. 423, 424 (D. Del. 2003) ("It is incumbent upon counsel in the first instance to order discovery demands, particularly against non-parties, in such a way that the burdens of giving evidence are reasonable, under all of the circumstances presented."); *Haworth, Inc. v. Herman Miller, Inc.*, 998 F.2d 975, 978 (Fed. Cir. 1993) (finding district court "properly require[d] [defendant] to seek discovery from its party opponent before burdening the nonparty").

"The party moving to quash a subpoena has the burden of persuasion, 'but the party issuing the subpoena must demonstrate the discovery sought is relevant.'" *Vysata v. Menowitz*, No. 18-cv-06157, 2019 WL 2871145, at *1 (C.D. Cal. May 30, 2019).

## IV.   INVENSAS' SUBPOENA SHOULD BE QUASHED IN ITS ENTIRETY

Invensas' Subpoena should be quashed in its entirety because it is overbroad and would impose an undue burden on Nonparty EVGA, particularly given that Invensas can obtain the information it supposedly needs from party-Defendant NVIDIA.  It also seeks irrelevant, confidential information that would harm EVGA if disclosed.  Each of the Requests and Topics included in the Subpoena are addressed below.

### A.   The Court Should Quash Invensas' Requests for Identification of EVGA Products and Unit Sales (Requests 1 and 2)

Requests 1 and 2 seek documents sufficient to identify: (1) each EVGA Product; (2) each Accused NVIDIA Chipset (by product family number) incorporated in each EVGA Product; and (3) the number of units of each EVGA Product sold in the U.S.

during the Relevant Time Period.  These Requests should be quashed because they seek irrelevant, burdensome, and unnecessary information.

### 1.   Requests 1 and 2 Seek Irrelevant Information

Invensas argues that sales of EVGA Products are relevant to its accounting of NVIDIA GPUs under its induced infringement claims.  But Invensas has not contested that, in its May 4 Order, the Delaware Court found that this information is not necessary to support its original induced infringement theories.  Instead, Invensas asserts new, speculative theories that are untied to the requested information.  Thus, Requests 1 and 2 seek irrelevant information under both Invensas' prior and new inducement theories.

### a.   Invensas' Prior Induced Infringement Theories

Invensas previously argued that "NVIDIA sold accused products to companies abroad and then induced those companies to sell the accused products in the U.S."  *See supra* at § II.A.2.  However, because NVIDIA stipulated that all its worldwide sales are U.S. sales, Invensas can assert direct infringement for any sales made directly by Defendant NVIDIA, without resorting to an induced infringement theory.  *Id.*  Indeed, the Delaware Court denied Invensas' motion to compel NVIDIA's customer information that was supposedly "critical" to its inducement claims because NVIDIA's stipulation made such discovery unnecessary.  *See* May 4 Order at 2 (Ex. B) ("Absent some showing that there is some potential prejudice to Plaintiffs by the proposed stipulation, I am not going to order what appears to be unnecessary discovery.").

Invensas also previously argued that it "may discover" that sales made by NVIDIA's wholly-owned subsidiaries subject NVIDIA to liability for direct or induced infringement.  *See supra* at § II.A.2.  The Delaware Court first noted that NVIDIA likely could produce its subsidiaries' sales information.  *See* May 4 Order at 2 (Ex. B) ("[I]t is likely that Defendant has the power to produce records ….").  Nonetheless, the Delaware Court held that the "power [to produce records] does not make the wholly-owned subsidiaries parties to this case or Defendant legally responsible for the actions of the subsidiaries.  Thus, the records appear to be irrelevant."  *Id.*

9

In sum, Invensas previously made the same relevance arguments about NVIDIA's subsidiaries' sales that it made for EVGA's sales (*e.g.*, relevance to induced infringement).  The Delaware Court rejected these arguments when it denied Invensas' motion to compel, stating that NVIDIA's subsidiaries' sales were "irrelevant."  As a nonparty, EVGA should not have to produce its sales data to support an inducement theory when the Delaware Court refused to compel similar discovery from a party.

### b.    Invensas' New Induced Infringement Theories

Invensas now argues that NVIDIA may be liable for induced infringement for: (1) "contracting to sell the accused GPUs to companies such as EVGA, with knowledge that EVGA would incorporate those GPUs in graphics cards and sell them throughout the U.S.;" and (2) "authorizing EVGA to sell products in the United States using NVIDIA's trademarks and IP (*e.g.*, 'GeForce')."  May 22, 2020 Email from Garten to Song (Ex. J).  Both of its new theories are speculative and neither justifies the discovery Invensas seeks.

Invensas' contract theory fails for several reasons.  First, it is inapplicable to EVGA because EVGA does not have any sales agreement with NVIDIA.  *See* Darwin Decl. at ¶ 26.  Moreover, even if NVIDIA had a contract to sell Accused Products to EVGA, any sale made by Defendant NVIDIA would be: (1) included in the worldwide sales reports that NVIDIA produced; and (2) based on NVIDIA's stipulation, included in Invensas' direct infringement claims.  Allowing this discovery from EVGA runs the very risk of double-counting that Invensas itself raised with the Delaware Court.

Invensas' trademark and IP license theory also fails for similar reasons.  First, it is speculative as it does not refer to any actual license, but merely refers to a possible license because NVIDIA's website identifies "GeForce" as an NVIDIA trademark.  *See* May 22 Email (Ex. J); s*ee also* https://www.nvidia.com/en-us/about-nvidia/legal-info/ (Ex. L).  "[R]equested information is not relevant to 'subject matter involved' in the pending action if the inquiry is based on the party's mere suspicion or speculation."  *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1326 (Fed. Cir. 1990); *see also*

*Barry v. Medtronic, Inc.*, No. 16-mc-47, 2016 WL 1056783, at *1 (E.D. Pa. Mar. 17, 2016); *Fadalla v. Life Auto. Prod., Inc.*, 258 F.R.D. 501, 508 (M.D. Fla. 2007) (holding that a nonparty is not required to produce information relevant to a speculative claim).

Second, it is insufficient because courts have held that "the mere act of licensing *by itself* does not evince an intent to induce infringement." *L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F. Supp. 1294, 1301 (C.D. Cal. 1994) (emphasis in original). A trademark license merely frees the licensee from a legal bar that would otherwise prevent it from accessing the goodwill associated with the trademark. *Id.*

Finally, Invensas fails to explain how the requested discovery is different from that denied by the Delaware Court. It does not show that NVIDIA GPUs contained in EVGA Products would not already be accounted for in NVIDIA's produced financial records or are distinct from those sold by NVIDIA's wholly-owned subsidiaries. Without such a distinction, Requests 1 and 2 are essentially an attempt to circumvent the May 4 Order. EVGA should not be required to produce information that the Delaware Court denied Invensas from obtaining from NVIDIA for lack of relevance.

In sum, Invensas does not contest that the Delaware Court found that this information is not necessary to support its original induced infringement theories, and its new theories fare no better, as they are speculative, inapplicable, and insufficient to establish the relevance of the requested information. Because Invensas failed to meet its burden to show their relevance, Requests 1 and 2 should be quashed.

## 2. Requests 1 and 2 Would Impose an Undue Burden on EVGA

Complying with Invensas' interpretation of Requests 1 and 2 would impose a significant burden on EVGA because none of the information sought by these requests is readily available or kept in the requested form in the ordinary course of its business. *See* Darwin Decl. at ¶¶ 13-17. It is unclear what authority Invensas believes gives it the ability to use a subpoena to force EVGA to assemble records and create documents that it does not use in the ordinary course of its business or have easy access to.

The Subpoena defines "EVGA Product" as any product sold in the U.S. during

11

the Relevant Time Period that contains an "Accused NVIDIA Chipset."  Requests 1 and 2 essentially seek a spreadsheet that, for each EGVA Product, includes: (1) an EVGA Product identifier; (2) the Accused NVIDIA Chipset product family number; and (3) the number of units sold.  However, the sales information EVGA maintains in the ordinary course of its business usually does not include the NVIDIA GPU product family numbers contained in its products.  *Id.* at ¶ 14.  Thus, there is no pre-existing document or report that can be readily generated containing the requested information.

Moreover, creating a spreadsheet containing the requested information would impose a significant burden on EVGA.  *Id.* at ¶¶ 15-16.  The task would require efforts from EVGA's product team, accounting and IT departments, and a supervisor coordinating their efforts.  *Id.* at 15.  Specifically, EVGA would have to dedicate members of its product team to specify the estimated 500 SKUs that contain an Accused NVIDIA Chipset.  At the same time, EVGA's accounting and IT departments would have to create more than 20 large quarterly sales reports, each taking significant processing time (4+ hours).  *Id.*  Then, the data from the product team and the quarterly sales reports would need to be aggregated, combined, filtered, scrubbed, and proofed. *Id.*  EVGA estimates that it would take 80 to 100 hours of EVGA employee time to create a list of responsive SKUs and unit sales by SKU, from the product lines that were current during the Relevant Time Period.  *Id.* at ¶ 16.

If legacy products were included, this process would take longer.  *Id.* at ¶ 17. For example, EVGA's product team would have to review even more SKUs to account for legacy products.  *Id.*  Moreover, because of the relatively short life-cycle of GPU-based graphics cards, the burden on EVGA to investigate legacy products would likely be disproportionately greater than any benefit to Invensas.  *Id.*  For example, EVGA currently has legacy inventory of as many as 100 distinct SKUs and estimates that total sales for legacy NVIDIA GPU-based graphics cards are less than 2% of annual sales. *Id.*  Thus, the increased burden on EVGA for legacy products greatly outweighs the minimal added value to Invensas.  *See Amini*, 300 F.R.D. 406 at ("In determining

12

whether a subpoena poses an undue burden, courts 'weigh the burden to the subpoenaed party against the value of the information to the serving party.'").

### 3.   Requests 1 and 2 Are Unnecessary

Requests 1 and 2 are also unnecessary because Invensas can obtain any arguably relevant information from Defendant NVIDIA rather than burdening Nonparty EVGA. For example, EVGA sends NVIDIA weekly reports that show the total number of units of each NVIDIA-based graphics card shipped to EVGA's customers by channel. Darwin Decl. at ¶ 25.  These weekly reports were intended to give NVIDIA insight as to how much of its product was hitting the market, generally, each week.  *Id.*  Thus, even if this information were relevant, the burden on EVGA to create records to meet Invensas' request is especially significant considering that business records that are created in the ordinary course of EVGA's business and sent to NVIDIA provide Invensas with much of the information (sales by units) that it claims to need.

In sum, Requests 1 and 2 should be quashed because they impose an undue burden on EVGA by seeking irrelevant information not maintained in the ordinary course of its business, especially when actual business records provide the information Invensas claims it needs and can be obtained from NVIDIA.

### B.   The Court Should Quash Invensas' Request for Revenue (Request 2)

Request 2 seeks, in part, revenue for sales of EVGA Products.  This Request should be quashed because it is overly broad, unduly burdensome, and seeks irrelevant, confidential information that if disclosed will cause competitive harm to EVGA.

### 1.   Request 2 Seeks Irrelevant Information

Invensas argues that revenue for EVGA Products sold in the U.S. is relevant to the determination of a reasonable royalty under *Georgia-Pacific* Factor 11: "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."  *See* May 22 Email (Ex. J).  This argument fails for several reasons.

First, because EVGA's revenue is confidential and not shared with NVIDIA in the ordinary course of business, it would not have been available to either Invensas or

NVIDIA during any hypothetical negotiation.   "The hypothetical negotiation …
attempts to ascertain the royalty upon which the parties would have agreed had they
successfully negotiated an agreement just before infringement began." *Lucent Techs.,*
*Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing *Georgia-Pac. Corp.*
*v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).   "The hypothetical
negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation
scenario and to describe the resulting agreement." *Id.*

Second, courts have denied discovery of a customer's sales revenue as irrelevant
to the determination of a reasonable royalty.   For example, in *Itex Inc. v. Westex, Inc.*,
the plaintiffs sued manufacturers of allegedly patented fabrics and the customers who
purchased the fabrics for use in garments for infringement of their patent for flame
retardant fabric.   No. 05-cv-61110, 2011 WL 856583, *1 (N.D. Ill. Mar. 9, 2011).   The
plaintiffs moved to compel discovery into the customer-defendants' revenue from the
sale of garments incorporating the allegedly patented fabrics.   *Id.*   The customers
objected, arguing their sales revenue was irrelevant and that compliance would impose
an undue burden on them.   *Id.*   The Court denied plaintiffs' motion to compel, finding
that the customers' "downstream sales information is not relevant in this case to any
theory of damages." *Id.* at *4.   In so holding, the Court rejected the plaintiffs' assertion
that the customers' data was relevant under the *Georgia-Pacific* framework because
the injury from the alleged infringement was completely captured by the
manufacturer's sales of infringing fabrics.   *Id.*

Similarly, in *In re Trustees of Boston University Patent Cases* (*"BU Patent*
*Cases"*), the Court rejected the plaintiff's argument that sales and revenues of
customers was relevant to damages against a manufacturer accused of patent
infringement.   No. 13-cv-12327, 2014 WL 12576638 (D. Mass. May 16, 2014).   In the
*BU Patent Cases*, the plaintiff sued light emitting diode ("LEDs") manufacturers and
sellers of consumer products that contained LEDs (the "Customer-Defendants") for
patent infringement.   *Id.* at *1.   The Customer-Defendants moved to stay the actions

against them pending resolution of the plaintiff's suit against the LED manufacturers. *Id.* In opposition to the motion to stay, the plaintiff argued it would be prejudiced by a stay because it would lose the ability to conduct discovery from the Customer-Defendants on their downstream customers and sales and revenue information. *Id*. at *4. The Court rejected this argument, noting it was "disinclined to impose significant discovery burdens on the Customer-Defendants." *Id*. at *5. In so doing, the Court found that "the sales and revenues of the Customer Defendants, derived from their downstream sales of end products, appear[ed] to have little relevance to [Plaintiff]'s damages claims against the LED manufacturers." *Id.*

Just as in *Itex* and the *BU Patent Cases*, EVGA's revenue is irrelevant to any theory of liability or calculation of damages. Any calculation regarding the reasonable royalty base or rate would depend on NVIDIA's sales and revenue, not on EVGA's revenue. In fact, allowing discovery into EVGA's revenues would be even more inappropriate than in *Itex* and *BU Patent Cases*, as EVGA is a nonparty, whereas in *Itex* and the *BU Patent Cases*, the customers were defendants in the actions.

Third, Invensas misunderstands Factor 11. In *Lucent Techs.*, the Federal Circuit stated: "Factor 11 relies on evidence about how much the patented invention has been used. Implicit in this factor is the premise that an invention used frequently is generally more valuable than a comparable invention used infrequently." 580 F.3d at 1333. Thus, Factor 11 does not relate to the monetary value of a downstream product, but rather, relates to the frequency that an invention has been used.

Tellingly, the only cases cited by Invensas do not even mention *Georgia-Pacific* Factor 11 and are easily distinguishable. For example, in *Crocs, Inc. v. Effervescent, Inc.*, the Court never mentions *Georgia-Pacific*, let alone Factor 11. No. 06-cv-00605, 2017 WL 3888455 (D. Colo. Jan. 30, 2017). Furthermore, in *Crocs*, Walgreens' sales and revenue were relevant to damages because Walgreens was a pure reseller of the accused product and there were no additional components added by Walgreens. *Id.* at *3. In addition, the Court held that Walgreens' resales were discoverable because they

1    were also relevant to the defendant's antitrust counterclaims.  *Id.*

2         Invensas also cites *Kilopass Tech. Inc. v. Sidense Corp.*, but that case also did

3    not discuss *Georgia-Pacific*, let alone Factor 11.  No. 10-cv-02066, 2011 WL 2470493

4    (N.D. Cal. June 21, 2011).  Indeed, there was no discussion whatsoever regarding the

5    relevance of the financial information at issue.  *Id.* at *3.  In fact, the subpoenaed

6    nonparty (Amimon) did not object to producing its financial information and even

7    produced some financial information before it filed its opposition to the motion to

8    compel.  *See* Amimon Opp'n to Mot. to Compel at 6, *Kilopass Tech. Inc. v. Sidense*

9    *Corp.*, No. 10-cv-02066 SI, ECF No. 109 (N.D. Cal. June 3, 2011) (Ex. M).

10        Here, EVGA is not a mere reseller, but rather, it uses NVIDIA GPUs to build

11   custom graphics cards.  Darwin Decl. at ¶ 2.  In addition, as a nonparty, EVGA has not

12   asserted any counterclaim placing its revenue at issue, but rather, timely objected to

13   producing such revenue information based on their irrelevance and undue burden.  *See*

14   Song Decl. at ¶ 18; *see also* EVGA Objections to Subpoena (Ex. I).  Thus, the cases

15   cited by Invensas are inapposite.

16        Fourth, Invensas' argument that "[t]he prices paid by end users for accused

17   products in the United States—in sales transactions that NVIDIA induced—is

18   probative of the value of NVIDIA's usage of the patented technology," is flawed

19   because it ignores unpatented components included in downstream products that

20   contribute to their value.  *See* May 22 Email (Ex. J).  *Georgia-Pacific* Factor 11 focuses

21   on the use "of the invention," not on unpatented components.  For example, in *Lucent*

22   *Techs.*, the patent involved "a method of entering information into fields on a computer

23   screen without using a keyboard" and the accused product was a date-picker tool in

24   Microsoft Outlook.  580 F.3d at 1308, 1317.  Under Invensas' flawed reasoning, the

25   value of a laptop with Microsoft Outlook would be probative of the value of the date-

26   picker tool.  But the Federal Circuit came to the opposite conclusion, vacating the jury

27   award for misapplying the entire market value rule.  *Id.* at 1336.

28        In sum, because revenue from sales of EVGA Products is irrelevant to Invensas'

16

claim for damages, "any burden whatsoever imposed upon [EVGA] would be by definition 'undue.'"  *WPIX, Inc.*, 2011 WL 9753912, at *2.

### 2.    Request 2 Would Impose an Undue Burden on EVGA

In addition to the burden discussed *supra* at § IV.A.2, producing revenue information for EVGA Products would impose additional undue burden on EVGA because the information sought by these requests is not readily available or kept in the requested form in the ordinary course of its business.  *See* Darwin Decl. at ¶¶ 14-15.

In general, EVGA's sales process is complex, not consisting of single-item purchase orders or invoices, but rather comprised of negotiated, bulk-item purchase orders and invoices.  *Id.* at ¶ 19.  Any given purchase order may cover more than dozens of EVGA SKUs, some of which may include NVIDIA-components and some of which may not.  *Id.*  EVGA has more than 20 material customers, each with distinct business terms, such as timing of payment, discounts, promotional support, return policies for unsold merchandise, etc.  *Id.* at ¶ 20.  Most of these customers buy a variety of products from EVGA, not just NVIDIA GPU-based graphics cards.  *Id.*  Customers pay EVGA; but, EVGA and its customers typically also exchange a complex series of credit and debit memos covering returns, offsets, and credits (discussed further below).  *Id.* at ¶ 21.  But typically, these payments are similarly bulk in nature and must be allocated to delivered products.  *Id.*

Thus, although purchase orders and invoices contain some pricing information, the ultimate price paid per unit is affected by many factors: (a) NVIDIA rebates made available both to EVGA's customers and in some cases directly to consumers; (b) EVGA promotional offers, used after delivery to help channels clear inventory (for instance, EVGA might offer a retailer $10/unit in credit for a certain period of time on a certain SKU); and (c) and other credits like price matching, point-of-sale rebates, consumer rebates, and general marketing support credits.  *Id.* at ¶ 22.  For these reasons, compiling revenue information in the form requested would require extensive additional time and impose an undue burden on EVGA.

Nonparty EVGA's Mot. to Quash

### 3.     Request 2 Seeks Confidential Information

In general, the pricing information between EVGA and its customers is confidential, is not publicly-disclosed, and is not disclosed to NVIDIA. *Id.* at ¶¶ 23-24. NVIDIA can never be fully screened from this information given its party status. *Id.* at ¶ 24. Public disclosure of EVGA's confidential pricing and revenue information, especially to EVGA's customers, would competitively harm EVGA. *Id.* The clearly confidential nature of EVGA's pricing and revenue information is thus, an additional basis supporting quashing Request 2, especially since Invensas has not shown a substantial need for such information or ensured that EVGA will be reasonably compensated. *See* Fed. R. Civ. P. 45(d)(3)(B).

While Invensas argues that "courts routinely protect the confidentiality of sensitive financial data during trials (*e.g.*, by sealing the courtroom for limited portions of testimony or argument)," it does not ensure that such procedures would apply to EVGA's revenue information. *See* May 22 Email (Ex. J). Moreover, Invensas does not explain how NVIDIA, as a party, could be excluded from such disclosure at trial. Thus, Invensas fails to adequately address the competitive harm EVGA would suffer if its confidential revenue information were disclosed to NVIDIA or its customers.

In sum, Request 2 should be quashed because it imposes an undue burden on EVGA by seeking irrelevant revenue information not maintained in the ordinary course of its business, and would cause EVGA competitive harm if disclosed.

## C.     The Court Should Quash the Requests for EVGA's Agreements and Communications with NVIDIA (Requests 3 and 4)

Requests 3 and 4 seek EVGA's agreements and communications with NVIDIA, respectively. Because Invensas can obtain these documents from NVIDIA, these requests should be quashed as burdensome and unnecessary. Their overbreadth, irrelevance, and potential for improper use also support quashing Requests 3 and 4.

### 1.     Requests 3 and 4 Are Burdensome and Unnecessary

Because Invensas can obtain any relevant documents from NVIDIA, Requests 3

18

and 4 are unnecessary and would impose an undue burden on EVGA.   Invensas concedes that it can obtain these documents from NVIDIA, but claims that it included these requests in the Subpoena as a precautionary measure in case NVIDIA does not produce them in the Underlying Action.   *See* Song Decl. at ¶ 20.   Considering the timing of the Subpoena, however, Invensas' purported rationale is, at best, speculative.

Under the current schedule, the deadline for NVIDIA to substantially complete its document production is August 19, 2020.   *See* Scheduling Order at ¶ 3c, *Underlying Action*, ECF No. 25 (Ex. N).   Invensas served EVGA with a Subpoena requesting documents it can obtain from NVIDIA on February 19—*seven months* before NVIDIA had to substantially complete its document production.

Also, the parties were not permitted to serve email production requests on other parties until after March 21, 2020.   *See* E-Discovery Order at ¶ 19, *Underlying Action*, ECF No. 37 (Ex. O).   Invensas served the Subpoena on EVGA on February 19, and listed March 6 as the compliance date.   Moreover, as of May 1, Invensas still had not yet served NVIDIA with any email requests.   *See* Song Decl. at ¶ 21.   Thus, Invensas requested emails from EVGA before even serving similar requests on NVIDIA.

Courts routinely quash subpoenas seeking documents from a nonparty that can be obtained from a party.   *See, e.g.*, *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal. 2007) ("There is simply no reason to burden nonparties when the documents sought are in possession of the party defendant."); *In re Delta*, No. 17-mc-328, 2018 WL 5033756, at *6 (D. Del. Oct. 17, 2018) (finding undue burden on nonparty to produce communications with a party); *Avago Techs. U.S., Inc v. IPtronics Inc.*, 309 F.R.D. 294, 300 (E.D. Pa. 2015) (holding that "documents should first be sought from a party instead of a non-party, particularly where the non-party is a customer of the party").   Two cases from this District are particularly analogous.

First, just like Invensas, in *Moon v. SCP Pool Corp.*, the plaintiffs served a subpoena on a nonparty seeking *inter alia* documents and agreements between the nonparty and the defendant.   232 F.R.D. 633, 635 (C.D. Cal. 2005).   The Court noted

19

that the "requests all pertain to defendant, who is a party, and, thus, plaintiffs can more easily and inexpensively obtain the documents from defendant, rather than from nonparty KSA." *Id.* at 638.  The Court granted the motion to quash and held: "Since plaintiffs have not shown they have attempted to obtain these documents from defendant, the Court finds that, at this time, requiring nonparty KSA to produce these documents is an undue burden on nonparty KSA." *Id.*

Second, just like Invensas, in *Duong v. Groundhog Enterprises, Inc.*, the plaintiff served a subpoena on a nonparty seeking *inter alia* agreements between the nonparty and the defendant before the plaintiff even served a document request on the defendant. 2020 WL 2041939, at *8.  The plaintiff explained that he served the subpoena on the nonparty because he anticipated that the defendant would not produce the documents. *Id.*  The Court noted that the plaintiff was obliged to first request the documents from the defendant, review any subsequent production, meet and confer with the defendant if it found any deficiencies, and raise the dispute with the judge presiding over the underlying action if the meet and confer were unsuccessful. *Id.*  While the motion to quash was moot because the plaintiff withdrew the subpoena, the Court granted the nonparty's motion for sanctions and awarded attorneys' fees, stating:

> [I]t appears that [plaintiff] chose to get ahead of an anticipated, though wholly speculative, deficient production from [defendant] by imposing a burden on a nonparty.  "Nonparty witnesses ... should not be forced to subsidize an unreasonable share of the costs of litigation to which they are not a party.... [A] witness's nonparty status is an important factor to be considered in determining whether to allocate discovery costs on the demanding or the producing party."

*Id.* (quoting *United States v. CBS, Inc.*, 666 F.2d 364, 371-72 (9th Cir. 1982)).

In sum, Requests 3 and 4 should be quashed because Invensas can obtain the requested agreements and communications from NVIDIA.

## 2.       Requests 3 and 4 Are Overbroad, Irrelevant, and Used for Improper Purposes

Their overbreadth, irrelevance, and potential for improper use also justify

quashing Requests 3 and 4. First, the requests are facially overbroad. Neither request has any time limit whatsoever. During the meet and confer process, Invensas also refused to put any time restrictions on either request. *See* Song Decl. at ¶ 20.

With respect to Request 3, Invensas stated that it seeks any agreement applicable to products sold during the Relevant Time Period. But Invensas only argues that Request 3 is relevant to its inducement claims. *See* May 22 Email (Ex. J). To the extent even still relevant following the Delaware Court's May 4 Order, any agreement that was entered into before NVIDIA had knowledge of the Asserted Patents cannot be evidence of an act of inducement. *See L.A. Gear, Inc.*, 859 F. Supp. at 1302. Thus, at minimum, this request should have been limited to contracts after October 2014.

With respect to Request 4, in addition to refusing any time restriction, Invensas seeks production of emails by a nonparty without any limit on the number of custodians or search terms. Thus, Invensas intentionally inflicts a much greater burden on Nonparty EVGA than on the parties, who are protected by the Delaware Court's E-Discovery Order. *See* E-Discovery Order at ¶¶ 20-21 (limiting email requests to 8 custodians and 10 search terms) (Ex. O). Because EVGA has about 15 points of contact with NVIDIA entities residing in multiple continents, if Request 4 were read broadly to require collection of 15 user email accounts without any time limits, as well as searches of the collected user email accounts using various terms, such efforts would be significant. *See* Darwin Decl. at ¶ 28. Moreover, even if such efforts were taken, it is highly unlikely that they would result in identification of responsive emails. *Id.* Thus, the burden would greatly outweigh any possible benefit to Invensas.

The overbreadth of the requests also increases their irrelevance. For example, Invensas incorrectly argues that a trademark license would fall under its request for contracts that "relate to the marketing, distribution, or sale of any EVGA Product." *See* May 22 Email (Ex. J); *see also* Darwin Decl. at ¶ 26. But even if responsive, such a trademark license would be irrelevant because "the mere act of licensing *by itself* does not evince an intent to induce infringement." *L.A. Gear, Inc.*, 859 F. Supp. at 1301.

With respect to Request 4, Invensas does not explain why communications between EVGA and NVIDIA about this litigation are relevant.  S*ee Free Stream Media Corp. v. Alphonso Inc.*, No. 17-cv-02107, 2017 WL 6209309, at *5 (N.D. Cal. Dec. 8, 2017) ("Plaintiff does not explain why communications between Defendants and Shazam about this litigation are relevant to the case.  Simply because Plaintiff asserts that these topics are 'undeniably relevant' does not automatically make them so.").  For example, Invensas complains that there are probably communications between EVGA and NVIDIA about its Subpoena, but fails to explain the relevance of those communications.  *See* May 22 Email (Ex. J).  Since four of the five Asserted Patents expired by October 2018, communications in 2020 could hardly be considered necessary evidence of inducement.  Invensas' complaint shows this request is not narrowly tailored, but rather, is a blind and burdensome fishing expedition.

Finally, Requests 3 and 4 may be used to improperly circumvent orders issued in the Underlying Action.  For example, allowing Invensas to seek EVGA's emails with NVIDIA from EVGA would essentially allow it to seek discovery of NVIDIA emails from more custodians than permitted by the E-Discovery Order.  In addition, similar to how its request for EVGA's sales information may improperly circumvent the Delaware Court's May 4 Order, Requests 3 and 4 could be used to circumvent future discovery orders issued by the Delaware Court.  Such danger for improper use would be alleviated by simply requiring Invensas to seek such information from Defendant NVIDIA, not Nonparty EVGA.

In sum, Requests 3 and 4 should be quashed for these additional reasons.

### D.    The Court Should Quash the Deposition

"Preparing and sitting for a deposition is always a burden, even when documents are not requested, particularly for a non-party."  *Amini*, 300 F.R.D. at 412.  Thus, "courts recognize that '[d]iscovery should be more limited to protect nonparty deponents from harassment, inconvenience or disclosure of confidential documents.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 04-cv-1371, 2006

WL 2604540, at *2 (D. Del. Aug. 24, 2006) (citations omitted).  The deposition should be quashed because it would impose an undue burden on EVGA, especially since many of the topics are irrelevant and/or the testimony could be obtained from NVIDIA.

### 1.    EVGA's Supply Chain (Topic 4)

Topic 4 seeks testimony regarding the supply chain for each EVGA Product, including the identity and location of every third party involved in the supply chain. This topic should be quashed because it is overbroad, unduly burdensome, and seeks irrelevant, confidential information from a nonparty that the Delaware Court denied Invensas from obtaining from Defendant NVIDIA.

As an initial matter, Invensas does not explain how EVGA's entire supply chain is relevant to any issue.  "A subpoena that 'pursues material with little apparent or likely relevance to the subject matter,' however, is likely to be quashed as unreasonable even where the burden of compliance would not be onerous." *Kirschner v. Klemons*, No. 99-cv-4828, 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (citing *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 50 (S.D.N.Y.1996)).

Further, information regarding all of EVGA's manufacturers, suppliers, distributors, and customers is confidential.  It is not publicly-disclosed and EVGA does not disclose all this information to NVIDIA.  *See* Darwin Decl. at ¶ 31.  Disclosure of this confidential information would harm EVGA.  For example, similar to concerns raised by NVIDIA in opposing Invensas' motion to compel disclosure of NVIDIA's customer information, EVGA also has concerns that Invensas would use this information to disturb and harass its customers.  *Id.* at ¶ 32.

Notably, the Delaware Court's May 4 Order denied Invensas' motion to compel disclosure of all NVIDIA's customers.  *See* May 4 Order at 2 (Ex. B).  As a nonparty, EVGA should not have to identify its customers when it was not required of a party.

### 2.    Documents Requested by Subpoena (Topics 1-3 and 5)

Deposition Topics 1-3 and 5 correspond to Requests 1-4, respectively.  The same burden described above for the Requests would also apply to these Deposition Topics.

1   In fact, a deposition would be even more onerous than producing documents due to the

2   burden of preparing a witness to provide such testimony.

3        Thus, even if EVGA were required to produce financial information in response

4   to Requests 1 and 2, a deposition is still not needed to explain the documents because

5   written instructions would be sufficient.   *See Intermarine, LLC v. Spliethoff*

6   *Bevrachtingskantoor, B.V.*, 123 F. Supp. 3d 1215, 1217-18 (N.D. Cal. 2015) (holding

7   that a deposition was unnecessary where text files explained the produced records).   In

8   addition, even if EVGA is required to produce documents in response to Requests 3

9   and 4, a deposition is still not needed because Invensas can question NVIDIA witnesses

10  regarding any agreements and communications with EVGA.   *See Audio MPEG, Inc. v.*

11  *HP Inc.*, No. 16-mc-80271, 2017 WL 950847, at *6 (N.D. Cal. Mar. 10, 2017).

12              **3.    Admissibility of Documents Produced (Topics 6-8)**

13       Deposition Topics 6-8 generally relate to ancillary issues, such as searches for

14  responsive documents (Topic 8), identification of relevant documents (Topic 6), and

15  the meaning and authenticity of produced documents (Topic 7).   A deposition is not

16  needed for these topics, as they can be addressed through documents or affidavits.   *See*

17  *Intermarine, LLC*, 123 F. Supp. 3d at 1217-18 ("Rule 902(11) 'was intended to obviate

18  the need for live witnesses to parade to the stand to support the admission into evidence

19  of business records.'") (internal citation omitted); *see also* Darwin Decl. at ¶ 34.

20  **V.    INVENSAS SHOULD BE ORDERED TO PAY EVGA'S COSTS**

21       Rule 45 requires "reasonable steps to avoid imposing undue burden or expense

22  on a person subject to the subpoena."   Fed. R. Civ. P. 45(d)(1).   "The court for the

23  district where compliance is required must enforce this duty and impose an appropriate

24  sanction—which may include lost earnings and reasonable attorney's fees—on a party

25  or attorney who fails to comply."   *Id.*   The Ninth Circuit has clarified that undue burden

26  warranting sanctions exists "when a party issues a subpoena in bad faith, for an

27  improper purpose, or in a manner inconsistent with existing law."   *Legal Voice v.*

28  *Stormans Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013).

Here, Invensas failed to take reasonable steps to avoid imposing an undue burden on EVGA.  For example, as discussed above, Invensas failed to narrowly tailor its requests to the facts of this case by including an overbroad time frame on the requested sales, unreasonably refused to withdraw requests contrary to the Delaware Court's May 4 Discovery Order, asserted speculative inducement theories, proffered relevance arguments for revenue based on inapposite caselaw, and sought irrelevant, confidential supply chain information from a nonparty that it was denied from seeking from a party.  Invensas also included requests seeking EVGA's emails with NVIDIA before requesting such emails from NVIDIA based on rank speculation that NVIDIA's production would be deficient.  Courts have sanctioned similar conduct.  *See, e.g.*, *Duong*, 2020 WL 2041939, at *10; *ASUS Comp. Int'l v. Micron Tech. Inc.*, No. 14-cv-00275, 2014 WL 12625461, at *4 (N.D. Cal. Apr. 21, 2014).

Finally, Invensas failed to timely participate in the meet and confer process, by refusing to provide its position (or even an estimated response date) for weeks, while at the same time unreasonably demanding immediate responses to coerce a nonparty to comply with its irrelevant requests.  *See* Song Decl. at ¶ 24; *see also* April 8, 2020 Email from Garten to Song (Ex. J).  Indeed, its failure to confer in a timely manner in response to EVGA's June 16, 2020 email led to the filing of this memorandum rather than a joint stipulation.  *See* Song Decl. at ¶ 25.

For these reasons, Invensas should be ordered to reimburse EVGA for its costs, including attorneys' fees, in responding to the Subpoena and filing this motion.

## VI.   CONCLUSION

For the foregoing reasons, Invensas' Subpoena should be quashed in its entirety, and Invensas should be ordered to pay EVGA's costs, including attorneys' fees, in responding to the Subpoena and filing this motion.

Date: July 7, 2020

By:  *s/ Michael J. Song*
Michael J. Song (SBN 243675)

*Attorney for Nonparty EVGA Corp.*